Filed 12/21/21  Pilibos v. Pilibos CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| SARAH PILIBOS, as Attorney-in-Fact, etc., <br><br> Respondent, <br><br> v. <br><br> ALEXANDER PILIBOS, <br><br> Appellant. | F082952 <br><br> (Super. Ct. No. 20CEFL02455) <br><br><br> **OPINION** |

APPEAL from an order of the Superior Court of Fresno County.  Rosemary T. McGuire, Judge.

McCormick, Barstow, Sheppard, Wayte & Carruth, Scott M. Reddie, Jerry D. Casheros, and Jessica M. Boujikian, for Appellant.

Whitney, Thompson & Jeffcoach, Timothy L. Thompson and Nikole E. Cunningham, for Respondent.

-ooOoo-

This case involves a restraining order issued under the Elder Abuse and Dependent Adult Civil Prevention Act (Welf. & Inst. Code, § 15600, et seq.).  The Fresno County Superior Court issued a restraining order against appellant Alexander Pilibos ("Alex") under Welfare and Institutions Code section 15657.03, the statute governing the issuance

of protective orders for elder and dependent adults who have suffered abuse. The order prohibits Alex from, among other things, having any discussions with his 100-year-old mother, Lucille Pilibos, about her estate plan.[1] The restraining order petition was filed on Lucille's behalf by the eldest of Lucille's five children, Sarah Pilibos, pursuant to a durable power of attorney.

The trial court denied the initial request for a temporary restraining order and set the matter for a hearing that would last 12 court days over several months. The court heard testimony from six witnesses—including Sarah, Alex, and Lucille—and admitted numerous exhibits. There were many hearsay statements attributable to Lucille and Alex introduced at the hearing. The trial court admitted these hearsay statements over Alex's objection because it believed Code of Civil Procedure sections 527.6, subdivision (i), and 527.8, subdivision (j), which have been interpreted as allowing the court to consider relevant hearsay in hearings conducted under those statutes, applied to Welfare and Institutions Code section 15657.03 proceedings. In its statement of decision, the trial court stated that it "strongly consider[ed]" the hearsay statements attributable to Lucille and Alex that were testified to by non-family members.

Alex raises three issues on appeal. His chief contention is that the trial court erred in admitting and relying on hearsay evidence in ruling on the petition. He argues that Code of Civil Procedure sections 527.6 and 527.8 apply only to restraining order proceedings brought under those respective statutes, and it was thus error for the court to conclude that those statutes' evidentiary rules applied in this Welfare and Institutions Code section 15657.03 proceeding. He then argues that section 15657.03, unlike Code of

---

[1] Lucille was born in October 1921. The restraining order was issued when she was 99 years old, but she is now 100.

Many persons involved in this case have the last name Pilibos. We will use these persons' first names for clarity.

2.

Civil Procedure sections 527.6 and 527.8, does not contain language providing that hearsay is generally admissible at the hearing on a petition brought under the statute.

Alex's second contention is that the trial court erred in excluding evidence of a written settlement offer he made to Sarah during a multi-month break in the 12-day hearing. The court excluded the evidence on relevancy grounds. Lastly, his third contention is that certain aspects of the restraining order are unconstitutionally overbroad.

We conclude the trial court erroneously found that Code of Civil Procedure sections 527.6 and 527.8 apply to Welfare and Institutions Code section 15657.03 proceedings and conclude section 15657.03 does not provide for the general admissibility of hearsay. However, we also conclude that much of the hearsay admitted in the hearing was admissible under the state of mind exception to the hearsay rule (Evid. Code, § 1250). Additionally, of the plethora of statements Alex calls our attention to in his brief, only five are inadmissible hearsay, and he has not demonstrated that the erroneous admission of inadmissible hearsay prejudiced him. We thus conclude that the trial court's erroneous admission of, and reliance on, inadmissible hearsay does not require reversal in this case.

We also conclude Alex has not demonstrated he was prejudiced by the court's exclusion of the evidence of his mid-hearing settlement offer. Finally, we reject Alex's arguments that some of the restraining order conditions are unconstitutionally overbroad.

We affirm.

**FACTS**

## I.     Background

We begin by providing a summary of the relevant history of the Pilibos family and of the procedural history of this litigation. We will provide more detailed facts in our summaries of each witness's testimony.

Y. Stephen Pilibos and Lucille were married for many years before Stephen's death in January 2014 at the age of 102. Lucille's net worth is estimated to be around

3.

$28 million. Stephen and Lucille had five children, in order from oldest to youngest: Sarah, Mary, Alex, Barbara, and Catherine.

For about the past 18 years, Sarah and her husband, Ralph Curtis, have lived in a cottage on the same 40-acre property where Stephen and Lucille resided, and Lucille continues to reside. Sarah handled Stephen's business and financial affairs before his death and continued to handle the affairs following his passing. Additionally, in 2004, Lucille executed a durable power of attorney permitting Sarah to take actions and make decisions on her behalf.

Mary is a California attorney with over 40 years in practice and a certified specialist in trust and estate planning and administration. Prior to 2012, Mary prepared her parents' trust and estate plan. The trust provided for an equal division of the estate among the five children.

Sometime after Stephen passed away, Alex, Mary, and Barbara received in the mail portions of their parents' trust documents. They learned that in 2012 their parents had a different attorney prepare a completely new trust, which they signed in August 2012 when Stephen was 100 years old. The new trust ("the 2012 trust") provides that Sarah and Catherine are to receive the bulk of the estate after both Stephen and Lucille die. Specifically, Mary and Alex are to each receive a cash gift of $500,000 when the surviving spouse dies, and Barbara is to receive the house she lives in which is currently owned by the trust; thereafter, Sarah and Catherine are to receive the residue of the estate. Sarah is to receive 60 percent of the residue and Catherine is to receive the other 40 percent.

Up until January 2019, Lucille was in good health, taking care of herself, living alone, and still driving. In late January 2019, she was hospitalized for an abdominal cyst for about one week and was bedridden thereafter for about two months. Since then, Lucille has needed caregivers 24 hours a day. She needs help dressing herself, using the restroom, bathing, preparing meals, and getting out of a chair. According to Sarah and

4.

others who would later testify at the hearing, Lucille has also declined mentally since her hospitalization.

Around April or May 2019, Alex began discussing Lucille's estate plan with her, including having discussions when Sarah was present. Alex believed, based on discussions with Lucille and how the prior trust was to distribute the assets, that Lucille disagreed with how the distributions were to be made by the 2012 trust. According to Alex's testimony, he thereafter assisted Lucille in finding a new lawyer that Lucille could meet with to make whatever changes she wanted to her trust. But according to Sarah, Alex coerced Lucille into setting up and attending this meeting with a new attorney. According to this new attorney, who testified at the hearing, Lucille said she did not want to make any changes to her estate plan. Alex also attempted to schedule a family meeting with Lucille and her five children to discuss Lucille's estate plan. Sarah rejected the suggestion of a family meeting because, according to her, Lucille did not want to change her estate plan. Sarah believed Alex was badgering Lucille and trying to get her to change her estate plan against her will. According to Sarah, what Alex was doing was upsetting to Lucille.

## II.    Restraining order filed

On June 22, 2020,[2] Sarah, pursuant to the durable power of attorney, filed on Lucille's behalf a Request for Elder or Dependent Adult Abuse Restraining Order under Welfare and Institutions Code section 15657.03. This request, which section 15657.03 refers to as a petition, sought to preclude Alex from any contact, direct or indirect, with Lucille and to require him to stay 100 yards away from her and her home.

The petition averred:

"Alexander Pilibos has been engaging in an unrelenting campaign to harass, coerce, manipulate and unduly influence Lucille Pilibos into amending her estate plan against her wishes. Alexander Pilibos, an

---

[2] Subsequent references to dates are to dates in 2020 unless otherwise stated.

5.

attorney, has even presented legal documents to his 98 year old mother to sign even though he knows she is represented by counsel. Lucille Pilibos has requested on multiple occasions, through her counsel, that Mr. Pilibos stop his coercion of her to make changes to her estate plan. However, Mr. Pilibos refuses to comply with those instructions despite knowing the harm it causes her."

The petition further alleged:

"As a result of Alexander Pilibos' conduct, Lucille Pilibos has suffered extreme emotional distress, anxiety, and fear. Lucille Pilibos has experienced physical manifestations of her extreme emotional distress, including loss of sleep and confusion. Her extreme anxiety and fear has even caused her to hide herself away like a prisoner in her own home in order to avoid seeing Mr. Pilibos."

The petition also sought a temporary restraining order without notice to Alex because "Lucille Pilibos is terrified of Alexander Pilibos and counsel is concerned that Mr. Pilibos will react irrationally or unpredictably if given advance notice of this request for restraining order." Sarah submitted four declarations to support the petition.

The trial court denied the request for a temporary restraining order because the facts presented in the petition "do not sufficiently show reasonable proof of a past act or acts of abuse of the elder or dependent adult by" Alex. The court then scheduled a hearing on the petition for July 16. The hearing ultimately commenced on September 24 and lasted 12 court days, concluding on March 8, 2021. The hearing was delayed for several months due to a witness's ill health.

## III. Pretrial ruling regarding hearsay evidence

Alex filed a motion in limine before the hearing "to preclude admission of any statements attributed to Lucille Pilibos." The trial court heard oral argument on the motion. Sarah's counsel argued the "court can also rely upon relevant hearsay, and it's admissible in restraining order hearings under CCP 527.6." The court initially granted Alex's motion, stating it was not going to allow "witnesses to come in and tell the Court what Ms. Pilibos said. So anything that you refer to about what she said, is—is not going to be admitted."

6.

Sarah was the first witness called. Early in her testimony, her counsel asked the court to reconsider its hearsay ruling, contending "the Court can, in a restraining order proceeding like this, allow and admit relevant hearsay." The court stated that if it changed its ruling, "we are going to be trying this case on hearsay, because we are going to have multiple witnesses coming in, saying, well, she said this. Well, no, she said that." Nevertheless, the court stated it would take another look at the issue that evening and revisit it the next morning.

The next day, Alex's counsel argued that Code of Civil Procedure section 527.6—which has been interpreted as allowing the court to consider relevant hearsay evidence in restraining order proceedings brought under that statute—does not apply to restraining orders sought under Welfare and Institutions Code section 15657.03. The court disagreed, concluding that Code of Civil Procedure sections 527.6 and 527.8 applied in Welfare and Institutions Code section 15657.03 proceedings. The trial court accordingly ruled that it would permit and consider relevant hearsay. The court and both counsel agreed that Alex could have a standing objection to all hearsay evidence and that Sarah could have a "standing response" that each hearsay statement would be admissible under a statutory exception to the hearsay rule.

## IV.    Evidence introduced at hearing[3]

### A.    Sarah Pilibos

Sarah testified she would not describe her family as close, as there has been "interfamily conflict" for at least 20 years. Alex had always been "very distant" with his parents and visited them "irregularly." In 2003, Alex sued Mary and Mary's husband over a business dispute. The litigation "ripped a lot of the family apart." In connection with the suit, Alex filed a state bar complaint against Mary seeking to have her disbarred.

---

[3] We are opting to not summarize the witnesses' testimony in the order in which they were called.

7.

The litigation was not resolved until 2007. After Stephen died, Alex did not have a strong relationship with Lucille and visited her irregularly.

Lucille experienced a significant decline in her health after her hospitalization. She lost her independence and requires 24-hour care. She needs assistance with getting up out of a chair, dressing, bathing, and using the restroom. She has also experienced significant mental decline. Alex became "very present" in April or May 2019 in that he began visiting Lucille more often.

Sarah estimated that she been inside of Lucille's house with Alex about three or four times since Lucille's hospitalization, and each time Alex brought up the topic of Lucille's estate plan with Lucille. Alex would discuss Lucille's estate plan with Lucille in Sarah's presence. During one conversation in approximately June 2019, Alex asked Lucille, "Why isn't it more fair?" "Why don't you have it more fair?" "Why isn't your estate plan more fair?" Lucille would say to Alex during these conversations, "I don't know why you're doing this." Lucille also said, "I don't want to change anything. Let me buy you a house. You should have a family. Why don't you move back in here with me. I just want you to be happy."

Sarah believed Alex was badgering Lucille during his visits to discuss her estate plan. She believed he was "pushing" Lucille to change her estate plan against her will. Sarah observed Lucille become upset and cry when Alex would bring up the subject of her estate plan. Sarah was concerned the discussions would negatively impact Lucille's health. Lucille would get stressed and confused and would have trouble sleeping and become disoriented. Lucille would ask after Alex left, "Why is he doing this to me? What does he want?"

Sarah described Lucille as a people pleaser. There were times when Lucille would agree to something and then later tell Sarah she did not want to do that. Sarah said that is part of Lucille's personality.

Sarah had gone over Lucille's estate plan with her many times, but Lucille did not always remember those conversations. Sarah told Lucille that she could change the estate plan anytime and that all she had to do was call the attorney. Lucille said, "No, I don't want to change anything. This is what dad and I did. This is the way we wanted it. Leave it alone."

Sarah had noticed personality changes in Lucille that began three to six months before Sarah testified in this hearing. Lucille has become more subdued. She likes interaction but is quieter and does not laugh as much. Lucille can have "social conversations" on "light topics," but would have difficulty discussing complex topics. Sarah stated Lucille is "losing her happiness."

Sarah testified that she had Lucille's best interests at heart, but that she does not believe Alex, Mary, and Barbara have Lucille's best interests at heart. She does not trust Alex, Mary, or Barbara and would not feel comfortable with any of them talking with Lucille about her estate plan unless someone else were present. However, Sarah does think it would be "wonderful" for Alex to continue to visit Lucille, so long as he does not discuss her estate plan. Sarah also stated that Lucille loves Alex and likes to call him.

### B. Mary Pilibos

Mary lives in San Francisco and is an estate planning attorney. She testified she had not seen Lucille much recently, maybe five times in 2019 and three times in 2020, but she writes Lucille notes and calls her. Lucille "seems fine" when Mary visits, and Mary has not seen her become disoriented. Mary could not remember that Lucille was in the hospital in January 2019.

Mary stated Alex was a favorite child since childhood. Lucille "idolizes" Alex and adores him. But Mary has not often had the opportunity over the years to see Alex and Lucille interact. Over the past five years, Mary only saw Alex and Lucille together at family gatherings. She also stated that Alex was a loner, not a loving person, and vindictive. She agreed with the suggestion that Lucille was a people pleaser.

9.

It was "unfathomable" to Mary that Lucille would fear Alex. Mary "know[s]" Lucille is intimidated by Sarah and Ralph. Lucille whispers around Sarah and Ralph. However, Mary stated Sarah and Ralph take good care of Lucille and they have devoted their lives to Lucille and Stephen.

Mary does not feel welcome at Lucille's home. One time when she came from San Francisco to visit Lucille, Ralph said to her, "What are you doing here?" Ralph follows Mary around whenever she is at Lucille's and keeps watch over her. Mary feels Sarah and Ralph are isolating Lucille from Mary.

On one occasion, Mary came from San Francisco to visit Lucille while Catherine was there. When Mary arrived, Catherine "blew up" at her and took Lucille away from the house for a couple of hours. Mary stayed at Lucille's house and waited for them to return. When Catherine and Lucille returned, Mary said hello to Lucille, then got into her car and drove back home to San Francisco.

Mary had her law firm prepare trust documents for her parents in 1991. Mary stated she remembered that those documents provided that each child receive an equal share of the estate. Later, in 2004, when Mary and Catherine were practicing law together, Mary prepared new trust documents for her parents that likewise provided that the five children were to share equally in their parents' estate.

Mary recalled that Lucille once told her on the phone that she wants all her children to be treated equally and that she would not have signed something that didn't treat all the children the same.

### C.    Barbara Meinert

Barbara is Lucille's second youngest child. She did not have a close relationship with Stephen but has a good relationship with Lucille. Barbara visits Lucille every Monday for about five hours to cook, clean the refrigerator, grocery shop, and read Bible stories to Lucille. Since Stephen's death, it has not been a welcoming feeling going to the house. She believes Sarah and Ralph are isolating Lucille from her and other people.

10.

Barbara testified Lucille loves Alex, talks about him often, and says how much she misses him. Barbara has never been at Lucille's at the same time as Alex. While Lucille has never expressed fear of Alex, she has expressed fear of Sarah and Ralph and has said that she does not want to do anything to upset them because they control her.

Barbara testified Lucille declined when she was in the hospital but has since recovered and is "doing great" now. When she speaks with Lucille, she feels Lucille is lucid and can carry on intelligent conversation. She has heard Lucille say numerous times she wants her estate divided equally amongst her children, including in the two months prior to Barbara's testimony. However, on cross examination, Barbara admitted there was a time when Barbara was reading the Bible to Lucille outside at Lucille's home and Lucille said, "We've got to get out of here. I'm at a facility." Barbara stated "everything was fine" again, though, when they went back inside.

Barbara stated Lucille is someone who likes to please people and does not like to be in confrontational situations. Lucille tells people things she thinks they may want to hear to avoid confrontation. Barbara agreed Alex is a loner, not a loving person, and vindictive. However, she does not think Alex is manipulative. Alex does not have a close relationship with any of his siblings. She does not think a restraining order is in Lucille's best interest because Alex is not a danger to Lucille and Lucille loves him.

On August 17, after Sarah had filed the restraining order request, Barbara took a video recording of Lucille. Barbara said Alex told her to take the recording. Alex provides only an excerpt of the transcript of the recording in his brief, but we will provide the entire recording.

> "Barbara: Alright, here it is August 17th, I do not want to be doing a video, because I look terrible, but I'm here with my mother and before I got out of the car. I came to take her to her podiatrist appointment, I was in my car and I drove up and um I got a call from my brother Alex's attorney's office telling me that um I was going to be sent a subpoena and um I gave my address for the subpoena to be sent and there is going to be a court date on um August 27th, Thursday. So I was given that information, and of

11.

course it's upsetting um and so I didn't say anything to my mother of course, I came in and we went go the podiatrist and then um, we read the bible and I don't know how it came up but um what was going on.  So, so when I told my mom um, you know she was quite upset and I'm gonna let her tell you what her request is.  I said, you know, that my father, it is my understanding we had a trust set up for the children um in the 80's it was written up and everybody was all the children were listed in it as beneficiaries of this trust and then um Alex told me that like in 2000 um no in um when dad was 101 the whole trust was thrown out and a new trust was written that was signed by my father and my mother that the only beneficiaries are my sister Sarah and my sister Catherine and that's why Alex is, um that we are having there is this issue with Alex and Sarah.  So, um my mom I'll let her tell you I'm going to turn it around which I think I can do this, how do I turn it around, what does that button do, so turn it around oh that makes a little sunshine.  I'm gonna go like this.  Okay this is mom.  Here's mom.

"Barbara:  Go ahead mom.

"Lucille:  What do I say.

"Barbara:  I um you say just say that when I told you what the trust, who benefits from the trust is Sarah and Catherine and Mary, Alex and Barbara are not beneficiaries of the trust either personal or

"Lucille:  That's ridiculous.  That's terrible.

"Barbara:  Yeah, and you want and then you told me that you want to go to an attorney.  Go ahead.

"Lucille:  Yes, I want to go to a good attorney, an honest attorney and I want everything equaled out with my children, all five of them.

"Barbara:  And then when I said you have an attorney, you said what about this the attorney that that you have.  Um I don't want to put words in your mouth.  What do you think you have this attorney, this woman attorney and um but you felt that, well you told me you felt that she was more partial to Sarah and works for Sarah and not you.

"Lucille:  Yes.

"Barbara:  And you want a whole new attorney.

"Lucille:  Yes.

12.

"Barbara:  Well, that's what you said.

"Lucille:  Yes, alright fine.

"Barbara:  No, well

"Lucille:  Yes that's what I said.

"Barbara:  That's what you said, maybe say it again for the record

"Lucille:  I want everything to be honest and fair.  Even with all the children not one getting more than the other child.

"Barbara:  Okay.

"Lucille:  Now, let's straighten this out so everybody has a fair chance to have a little life in their life

"Barbara:  Okay and I'm not holding a gun to you.

"Lucille:  Oh no you're not doing anything Barbara

"Barbara:  Okay, so now that's what mom's wishes are that's what mom's wishes are

"Lucille:  Yeah

"Barbara:  and that's that."

Barbara took another video recording of Lucille at Alex's request on September 7. Alex does not mention this recording in his brief.  We reproduce the entire transcript of the recording.

"Barbara:  Oh my gosh, okay, so here I am again, it's Monday, I've come to visit mom, it's Monday, Labor Day and I've come to visit mom and um

"Lucille:  She feels very bad at what I've done

"Barbara:  Um here, here's mom, okay, go ahead mom

"Lucille:  Hi, Alex I miss you and I'm so sorry what I've done, and I want to see you, you are my friend, and you used to come over and see me and I miss your visits.  So please forgive me for my, maybe because I'm so

13.

old I'm a little bit rusty in the brain. Forgive me. Please come and see me. Please, please come and see me.

"Barbara: Okay

"Lucille: And I will call my lawyer too, to make sure that nobody bothers you.

"Barbara: Oh that's nice, yeah, maybe you call, yeah, call your attorney. Mom's going to call her attorney and tell her this is her wishes. And that why no one's listening to her, we don't understand why no one listens to her. These are her wishes. This is her attorney and her attorney is supposed to be representing her, right?

"Lucille: Have him come and see me.

"Barbara: What about this restraining order against Alex, what do you think of that one? Do you want him to stay away? Are you scared of Alex?

"Lucille: No, no, no. No, Alex and I were real close friends you know. He used to come and see me all the time.

"Barbara: Right

"Lucille: and now I never see my son anymore and it's my own fault, it's my fault.

"Barbara: Well I don't know whose fault it is.

"Lucille: Yes it is, it's my fault. I've got to

"Barbara: What did you do that you think it's your fault?

"Lucille: I want to get this straightened out.

"Barbara: Yes, but I don't, but don't blame yourself mom.

"Lucille: And I have to get it straightened out from my attorney

"Barbara: Yeah, maybe that's it.

"Lucille: She's got to clean it up, that's it.

"Barbara: Yeah, okay, well that's it.

14.

"Lucille: And you know what, he might turn around and say the heck with her

"Barbara: No he loves you Mom

"Lucille: I love him too

"Barbara: Well he loves you and you know what this shouldn't be happening.

"Lucille: Good."

## D.    Alex Pilibos

Alex described his relationship with his father as very close and personal from 2000 until Stephen's death in 2014. He stated they had disagreements "like anyone else would," but he always respected his father and enjoyed working with him. He saw Lucille once every other week during that period. He stated he has a "close personal bond" with Lucille. Alex recalls the litigation with Mary and her husband and remembers trying to get Mary disbarred. However, he said that all those legal matters had settled and that they had "buried the hatchet."

Alex began discussing Lucille's estate plan with her in summer 2019. Alex often recorded the conversations he had with Lucille. He said that Lucille is usually the person who brings up the trust during their conversations, and that she has never told him it was upsetting to her when they discussed her trust. He also stated that Lucille has never seemed scared when they discussed her estate plan and that he has never yelled at or threatened her.

Alex testified he discussed the 2012 trust with Lucille and asked her if it was consistent with what she wanted to do with her estate. She said it was not what she wanted and said she wanted her children to be treated equally. Alex then told Lucille to write her feelings down. He said, "Write your feelings down, whatever you are feeling. Just write them down. I want a record of this, what you just said." Lucille then wrote a

15.

handwritten letter to Alex while Alex was there. The letter was dated "May 2019" and read:

"Dear Alex:

Please help me. I want a lawyer. I do not have a will.

I do not understand what or where my property is but I want a will. Please help me.

I want all my children to share. Please Alex, I beg you to help me, help me now. Would please like the lawyer to come to my house.

Love Mom

P.S.

Mothers Day this was written by my self"

Sometime after, Alex called the attorney who prepared the 2012 trust, William Coleman, and told Coleman that Lucille wanted to meet with him to discuss her trust. Alex took Lucille to the meeting with Coleman. Coleman and Lucille met privately in a room. When they came back out, Coleman stated he would make the changes Lucille demanded. Alex testified he did not know any specifics that were discussed in that meeting but stated he does know that Coleman did not make any changes.

Alex stated Lucille told him once, "You keep telling me that two kids are going to get everything, and three kids are, are being cut out. Where is this document? Why don't I have a copy of it? Can't I see?" Alex said he would send her a copy. Alex mailed a copy of the 2012 trust to Lucille and included in the envelope a note that read: "Mom—here is the trust document you signed that disinherits 3 of your children. The most important pages are pages 8—13. Page 12 is marked. It gives 60% of your estate to Sarah & 40% to Catherine."

Alex testified it is clear to him that Lucille is "being fed systemic misinformation by a very special interest in this family, and that family's committed to maintaining the

16.

status quo." He continued, "They got her to sign a document not knowing what it says, and now they don't want anyone or anything coming between that to change it." He also stated, "And so I've taken it upon myself to make sure that her true wishes, which she has expressed to me many times, which I've recorded, are in fact honored, and that she's not disrespected at this stage of her life and her good nature taken advantage of."

Alex acknowledged that her mother's estate plan was last amended in 2012 when both Stephen and Lucille were alive. However, he said, "I expect that my mother had no idea what it said. She was just told to sign something, and she signed it." He stated he believed his parents were "duped" into signing the 2012 trust but did not specify who duped them.

When Lucille's estate plan came up in discussions, Lucille would say to Alex she wanted all her children to take equal shares of the estate. Alex would then "have to explain to her that that was impossible because two of them had already arranged things so they would get the entirety of [his] father's estate less the contingent gifts to me and to Mary, a cash gift." He testified he has never told Lucille she needs to change her estate plan, and instead has told her that what she wants to do with her estate plan is up to her.

Alex also testified Lucille and he have always liked the idea of having a family meeting so that they can all "get together and hear what everybody has to say and hear their grievances" regarding the estate plan. He further stated, "I just think it's important for everyone to have all the facts, and I think the best form to do that in a non-confrontational way is a family meeting." He also said he thinks "it's important that everyone has a say."

There was a family meeting at Lucille's house in October 2019 with Lucille, Alex, Catherine, and Sarah. Alex recorded the meeting. Lucille became very upset during the meeting and started crying and said, "I can't take this anymore." "You wanted an airplane, and father bought you an airplane. What else do you want from your dad? He's

17.

dead now." "You're a grown man. I just want you to grow up." Alex said these words from his mother hurt him very deeply.

Alex stated that if Lucille were given the chance to meet with an independent person, and if she told that person she is satisfied with how her trust distributes her estate and that she does not want to make any changes, he would accept that and walk away.

Alex testified before Mary and Barbara, and he admitted he communicated with both of them about other witnesses' testimony. He also admitted he understood that his own lawyers made an unopposed motion at the beginning of the hearing to exclude witnesses from the courtroom in part so that they could not hear the testimony of other witnesses. He said he made a mistake.

### E.     Patricia Ventura

Patricia Ventura is a caregiver for Lucille. At the time of her testimony, she had been caring for Lucille for about one and a half years, working four to five days a week from 7 a.m. to 3 p.m. The company she works for was hired by Sarah. She testified Lucille needs help with "everything"—showering, brushing her teeth, eating, changing, and using the restroom. Lucille cannot turn on the television, change the stations, or use the telephone without assistance.

Lucille was a very happy, outgoing person when Ventura first came to work for her. Lucille told Ventura before Ventura met Alex that there was "some distance" in Lucille and Alex's relationship. Alex began visiting his mother around Easter 2019 and Ventura has seen Alex at Lucille's house approximately eight times. Alex brought up the subject of the estate plan during about five or six of those visits; Lucille never brought the topic up herself during any of those visits. Alex would ask Lucille if she has read through her estate plan or if she has a copy of it and ask her if she thinks it's fair. Lucille would respond, "Whatever my husband and I wrote, that's what's going to be, and I'm not planning to change anything." However, Ventura has also heard Lucille say in front of Alex that she wanted all her children to be treated equally. Ventura explained that

Lucille does not express to Alex what she really wants to express to him and instead tells him what he wants to hear.

Ventura explained that when people came to Lucille's house to visit, Ventura typically stays in the room because Lucille is a fall risk. When Alex visits, he usually asks Lucille to ask the caregivers to leave the room. Alex would take Lucille to her bedroom or to the office in the house. It concerned Ventura that Alex asked her not to sit in those meetings because none of the other kids asked to be alone with Lucille. It appeared to Ventura that the estate planning topic upset Lucille. Lucille once told Ventura it was upsetting to her that Alex kept bringing up the estate planning subject. After Alex would leave, Lucille would say something like, "Why? Why does he want to change it?" Or, "What does he want?"

In the year and a half prior to Ventura's testimony, Ventura became concerned that Alex had been attempting to influence Lucille regarding her estate plan. Alex would try to record Lucille while discussing the estate plan, and there were times when Lucille did not want to talk about it. Ventura had become suspicious of Alex being alone with Lucille because Alex told Ventura he was planning to sue Sarah, and Ventura was concerned perhaps Alex was trying to extract evidence from Lucille or make Lucille sign something. Alex asked Lucille many times if he could record her and Lucille always said no. Alex would then leave without saying goodbye. She never saw Alex yell at, threaten, or physically abuse Lucille, but he would become upset when Lucille said she did not want to be recorded.

Ventura was never concerned Sarah was influencing Lucille. She also had never heard Barbara, Mary, or Sarah discuss Lucille's estate plan with Lucille. She overheard Sarah tell Lucille that Lucille was free to change her estate plan, but Lucille said that she did not want to change it and that it would remain how Stephen and she did it.

19.

**F.      Attorney Robyn Esraelian's involvement**

As stated earlier, Alex sent Lucille a handwritten note stating her current estate plan disinherits three of her children and gives the entire estate to the other two. Additionally, on February 13, Alex drafted and personally presented a letter for Lucille to sign authorizing Alex to obtain copies of William Coleman's files. The letter read, in all capital letters:

> "I GIVE MY SON ALEX THE RIGHT TO COPIES OF ALL
> FILES YOUR FIRM RECEIVED FROM BILL COLEMAN'S OFFICE.
>
> LUCILLE PILIBOS"

Lucille signed and wrote the date, February 13, below the typed text.

Thereafter, in February 2020, Lucille retained attorney Robyn Esraelian, an attorney with 40 years of estate planning experience, to represent her with respect to her personal estate planning. Esraelian was initially contacted by Lucille's other attorneys, Timothy Thompson and Niki Cunningham, about potentially representing Lucille. Thompson and Cunningham were representing Lucille in her capacity as trustee of the 2012 trust. Esraelian remembered Lucille and her family from when she was a young girl.

Esraelian met Lucille in February 2020 at a meeting at Lucille's home. Thompson, Cunningham, Esraelian, Lucille, and a caregiver were there. Neither Sarah nor Alex was present. The three attorneys met with Lucille with the caregiver within earshot. Esraelian said the focus of the discussion at that first meeting was the February 13 authorization Lucille signed. Esraelian stated, "As a result of discussing that letter, Lucille made it absolutely clear that she did not want Alex or his attorneys, or anyone else, to see her estate planning documents." Esraelian explained to Lucille she could make changes to her estate plan at any time, and Lucille "stated in no uncertain terms that she did not want to make any changes to her existing estate plan." Esraelian

20.

believed that to be Lucille's true intent. Lucille indicated that she wanted to retain Esraelian.

Esraelian returned a week later with an engagement letter that Lucille signed. No one else was present during this second meeting with Esraelian except for the caregiver, who was again within earshot. Esraelian discussed with Lucille again whether she wanted to make any changes to her estate plan, and Lucille "made it clear again and stated several times that she did not want to make changes to her estate plan." Lucille also told Esraelian "something to the effect … that Alex kept trying to get her to do something that she didn't want to do." Lucille kept saying to Esraelian, "I just want everyone to get along. I just want to be at peace. I don't want to discuss this with Alex or anyone else for that matter." Lucille said she wanted to continue to see and visit with Alex, but just did not want to discuss her estate plan.

During that second meeting, Lucille suggested to Esraelian that Lucille should write a letter to Alex revoking the letter she signed on February 13 authorizing Alex to obtain Lucille's legal files. Lucille said Alex brought the consent letter over to her house and told her to sign it. Lucille handwrote a letter to Alex revoking her prior written authorization and telling him to speak to her attorney regarding estate planning matters. Lucille signed and dated the letter to Alex February 21. Lucille told Esraelian that she was so afraid Alex might hand her another document to sign that she asked Esraelian to prepare envelopes for her so that if Alex showed up with documents, she could put them in an envelope and mail them to her.

Esraelian wrote a letter to Alex's attorney, Rex Haught, enclosing Lucille's letter. Esraelian's letter advised Haught that Lucille has revoked the document she signed on February 13 and that Lucille does not want Alex to present any other documents to her for signature without first having Esraelian review them. Esraelian's letter also read:

> "It is my understanding that Alex was previously instructed not to have communication with Lucille regarding her estate plan or estate

21.

planning documents. He has obviously disregarded that instruction. Alex's continued efforts to discuss Lucille's estate plan and estate planning documents is extremely upsetting to Lucille. If Alex continues this conduct, I may be forced to take other action to prevent this unreasonable pressure and attempt to unduly influence Lucille."

Haught responded with an email suggesting a "family meeting" with all the children and Esraelian. Esraelian responded in writing stating, "We will not have a 'family meeting' as requested," and reiterating the message in one of her prior letters that "Alex is to 'refrain from discussing Lucille's estate plan or estate planning documents with her.' " Esraelian and Haught exchanged additional correspondence but nothing changed.

Esraelian stated she often gave Lucille the opportunity to discuss possible changes to her estate plan. However, Lucille did not even want to discuss potential changes. Lucille would say things along the lines of, "My husband and I did this together, and what we did together is going to stay the way it is. I'm not going to change what we – what we decided to do." Esraelian explained to Lucille what the ultimate distribution of her estate would be under the 2012 trust, "simplify[ying] it down to the specific gifts and then the gift of their residuary." But Lucille did not want to discuss it any further than that.

Esraelian also testified that, over the course of her attorney-client relationship with Lucille, Lucille became less able to track their discussions and less able to understand what Esraelian was explaining to her. Esraelian tried to explain Lucille's healthcare directive to her because it was outdated and the financial durable power of attorney because one of the individuals named in it was no longer in her life, but Lucille had trouble understanding Esraelian's discussion of those documents. Esraelian therefore made no changes to those documents because she did not think Lucille had the capacity to understand them. Esraelian also stated it was her understanding that William Coleman

22.

withdrew from representing Lucille because of Alex's pressure to get her to change her estate plan.

### 1. *Esraelian's purported termination*

On Monday, May 4, Alex sent Barbara the following email at 12:24 p.m.:

"Barbara:

You called me today from mom's house and told me mom desperately wanted to talk to me.

I told you to tell mom that I cannot talk to her about her estate or any related matters; and her attorney Robyn Esraelian basically threatened me with possible legal action if I did. Robyn also forbid a family meeting to try and resolve estate issues.

Tell her I'm sorry but I can't take the chance of getting sued. Wish her a Happy Mother's Day and Easter etc for me. My thoughts are with her.

Alex."

Phone records introduced at the hearing showed that Alex and Barbara called each other 15 times on May 4 between 11:38 a.m. and 5:17 p.m.. Alex and Mary also called each other seven times that day between 11:41 a.m. and 4:50 p.m., the last call lasting 28 minutes. Alex testified that he sent that email to Barbara after Lucille called him wanting to talk about her estate. Alex said he told Lucille that threatening letters had been sent to him. Alex said he told Lucille, "I really can't talk to you. Not comfortable talking about this as long as you are represented." He further stated to her, "You need— you need a lawyer that's going to, to be impartial and truthful with you, and I don't believe that this is the lawyer that you have right now. As long as she's working for you, I really can't help you." He testified Lucille was surprised to learn Esraelian was sending him cease and desist letters. Alex said Lucille asked him, "So what if I fire [Esraelian]?" Alex said he responded, "You do what you want."

23.

Also on May 4, Lucille called Esraelian's office and left a voice message stating, "I found out that I no longer need your services." Barbara was with Lucille when she made the call. Esraelian thought the voicemail was "unusual." Esraelian called Lucille back later that afternoon to confirm that she wanted to terminate the representation. Lucille said to her, "I don't want to fire you." Esraelian met with Lucille the next day. Lucille told her that the day before someone picked up the phone, dialed, gave the phone to Lucille, and told Lucille, "Now, do what I tell you to do or say what I tell you to say." But Lucille could not remember who that person was.

On May 5, one of Alex's attorneys, Phil Martinez of Wild, Carter & Tipton, sent an email to Esraelian stating Martinez had heard that Lucille had left Esraelian a message terminating her representation. Martinez asked Esraelian to confirm if that was true. Alex testified he did not know how Martinez's law firm learned about Lucille's voice message for Esraelian. However, he admitted the only people he could think of who would have informed Martinez's firm are himself and Esraelian. Alex's phone records also showed that he made two calls to Wild, Carter & Tipton on May 4, the first one at 1:14 p.m., and the firm also made one call to him that day, for a total of three calls. Alex also called Wild, Carter & Tipton two times the next morning, and the firm made one call back to him, before Martinez sent his email to Esraelian inquiring about the alleged termination.

Alex acknowledged that he was asked multiple times by Lucille's attorneys not to talk with Lucille about changing her estate plan, and that he was told in each of those letters that Lucille did not want to make changes to her estate plan. However, he testified that he did not agree with the premises of the letters from Lucille's attorneys because those lawyers were all hired by Sarah "to feed [Lucille] misinformation." He said if she

24.

told him directly to stop discussing her estate plan with her then he would stop, but she did not ever do that.[4]

### G.   The June 5 incident

Also, on May 4, the same day Lucille called Esraelian to purportedly terminate her, Lucille made a phone call to attorney Joseph Doerr's office and told Doerr she wanted to make an appointment to come see him regarding her estate plan. Phone records show that Alex made a phone call to Doerr's office at 12:50 p.m. that day, and a call to his cell phone at 12:51 p.m..

Doerr is an estate planning attorney in Fresno. Alex had been in contact with Doerr for about a year and told him Lucille wanted to leave her current attorney, William Coleman, and make some changes to her estate plan. Doerr said he had had about six conversations with Alex. Alex told him that Lucille wanted to amend her estate plan so that all five of her children shared equally in her estate. Alex also told him that Sarah was controlling who Lucille got to see and prevented Lucille from seeing her own estate planning attorney and getting things done the way she wanted.

Doerr testified he spoke with Lucille twice on May 4. During the first call, Doerr asked for her phone number, and Lucille said, "I don't even know my phone number." It took Lucille about 20 seconds to remember her number. Doerr then called back to schedule an appointment. Barbara was present when Lucille spoke to Doerr, but Alex was not. The meeting was ultimately set for June 5.

Alex showed up to Lucille's house on June 5 at about 9:30 a.m. when Lucille had just finished eating breakfast. Ventura was on duty at the time. Alex brought with him a private investigator named James who Lucille did not know. Alex introduced James and

---

[4] Alex was asked by Lucille's counsel: "And you certainly didn't care what any of the lawyers had been telling you on her behalf, and that was to leave her alone and stop talking to her about trust changes; correct?" Alex answered: "When she is around me, she's chipper and happy and always happy to see me."

then took him into a private room in the house. Alex and James returned about a minute later and Alex told Lucille he wanted to take her to lunch. Lucille said she did not want to go because she had just finished eating breakfast. Ventura thought it was strange because it was only 9:30 a.m. and because of the COVID-19 pandemic.

Lucille eventually agreed to go. While she was in the bathroom, Alex tried to hurry her up: "Come on, Mom, let's go." Ventura testified Alex seemed very nervous and "shivery." As Lucille and Ventura were walking out of the house with Alex and James, Ralph approached Alex and said Alex was not going to take her. Lucille said she was going to go with her son, and they got into the car and left. Alex had hired a driver.

Ventura did not know where they were going when they got into the car. Alex then told Lucille he was taking her to see a "friend." Lucille said she wanted to call Sarah, but Alex said she could call her when they were finished with what they were doing. Ventura testified Lucille looked nervous in the car, and Ventura patted Lucille's hand and said, "It's okay, you're fine."

When they arrived at Doerr's office, Alex called to let the staff know Lucille was coming. He then told Lucille someone was waiting for her. Lucille went with Ventura from the car to the office. As they were walking, Lucille told Ventura she did not understand why she was going to the office or who she was there to see. Lucille stated, "I don't know who I am going to see." Ventura said, "I don't know either."

Ventura told Doerr's receptionist Lucille is here. The receptionist said, "Oh, yes, she called to make an appointment." Lucille said, "I don't remember making an appointment." Lucille and Ventura then went into a room with Doerr. Doerr testified the meeting started at 10:32 a.m. Lucille asked Doerr if it was okay if Ventura stayed with her and Doerr said it was.

Doerr testified he asked Lucille if she knew why she was there, and Lucille said she did not know. Lucille stated she did not remember speaking with Doerr on the phone the month before and asked, "What am I here for?" Doerr explained he was an estate

26.

planning attorney, but she did not understand what that was. He then explained he helped people with wills and trusts, and she understood that. Lucille told him Alex arrived that day and told her he was taking her to lunch. She said she got in the car with him so that he would not get angry with her.

Doerr testified that Lucille told him she was "terrified" of Alex, and Doerr got the sense that she did not want to disappoint Alex. She was afraid Alex would get mad if she did not do what he said. He asked Lucille if she wanted Ventura to leave the room but she said no. Doerr felt it was appropriate for Ventura to remain in the room because he did not think there was going to be any estate planning business conducted that day and because he did not want to add to Lucille's stress. Doerr decided within the first couple of minutes that he was not going to be doing anything regarding Lucille's estate plan.

Doerr further testified Lucille was afraid and he tried to comfort her. He testified he did not want to cut the meeting short because that may be a "bad sign," so he made the meeting last 30 minutes and passed the time by just talking with her about other things. Lucille could not remember her daughter Catherine and said she forgot how many children she had; she said three or four. He could tell by the tone in her voice and look in her eyes she was distressed, and he did not feel it would have been appropriate to prepare estate planning documents for her that day. Lucille told him several times she was "terrified" of Alex and did not want Alex to be mad at Doerr.

It was clear to Doerr that Lucille did not want anything to do with her estate plan. Lucille said her husband handled the estate plan and knew what he was doing. She said that women should not be making those kinds of decisions. She said it should have been done by her husband and said, "I want things left alone."[5] Doerr got the impression Lucille did not want to discuss her estate plan with anyone. Doerr said he had some

[5] Ventura also testified that Doerr asked Lucille if she wanted to change her estate plan and Lucille responded, "No, I don't. I don't want to change it."

27.

doubts about her competency during the meeting and noticed she had trouble remembering things, but observed she otherwise seemed to understand what they were discussing during the meeting. Doerr testified that he thinks the topic of Lucille's estate plan should be "off limits" until she can perhaps speak to a third party about her wishes.

When Lucille and Ventura were walking back to the car where Alex was waiting, Lucille told Ventura that she was going to tell Alex that everything was fine and that she met a very good person and that she wasn't going to say anything else. Alex asked Lucille how it went and Lucille responded, "It went very well. He's a very good person." Alex did not take Lucille to lunch, as she wanted to go back home. Alex asked if Lucille wanted to see Doerr again and Lucille said, "Well, if he's your friend, he's my friend."

Ventura testified Lucille was very upset when she got home. She said, "I can't believe Alex is doing this. What does he want from me?" The rest of the day Lucille was confused, was not herself, and did not feel like eating. Ventura testified that after what happened that day Lucille did not sleep well and would wake up and not know where she was.

Sarah arrived at Lucille's house late in the afternoon on June 5. Lucille looked sullen and asked if everyone could leave the room. Lucille then asked Sarah if Lucille had any children and if she had a son. Sarah told Lucille her son was Alex. Lucille was trembling and very scared. Lucille said, "There was a man here today that could not have been my son. I don't know who that man was, but that man could not have been my son. He was not." "He was terrible." "I don't know who those men were. I don't ever want them to come back. I never want to see them again."

Sarah further stated that Lucille's mental health has worsened since June 5 and that she has been prescribed new mental health medication. Lucille forgets where she is when she is at home and becomes disoriented. In the days following June 5, Lucille would not get up and get dressed like she usually did.

## H.     June 9 incident

According to Sarah's testimony, Alex called Lucille on June 9 and said he was coming over with a friend, and Lucille said he could.  Sarah stated Lucille was "nice" to Alex on the phone, but when Lucille hung up, she said, "I don't want to see him.  I don't want to see anybody.  I'm afraid.  I don't want anybody to come over."  Lucille said she wanted the curtains drawn, the doors locked, and the phone unplugged.  She asked, "What if he comes to the house and knocks on the door?  He'll go around.  He'll look in the windows."

Sarah further testified that after Lucille's June 9 phone call with Alex, Lucille did not want to leave her bedroom for a couple of days.  Lucille made Sarah put a sign in the front window that said, "If you want to talk about the estate plan, call the attorney."  The sign had Esraelian's phone number on it.

## I.     Lucille Pilibos

Lucille was called to testify by Alex.  Lucille gave her testimony in a conference room at the courthouse with the judge and both parties and their counsel present.  The court asked Lucille some questions before allowing the parties to voir dire Lucille for the purpose of establishing Lucille's competency to testify.

The judge asked Lucille if she knew why she was there that day and Lucille said she did not.  The judge introduced herself and told Lucille her lawyers were there in the room.  The judge asked Lucille if she remembered her lawyers and she said, "Because I'm so old, I forget."  Lucille promised to tell the truth.  The judge asked Lucille how old she was and Lucille answered, "I think I'm 99."  Lucille did not know what day it was and said, "Why am I so scared?  I think I'm going to jail or something."

Lucille said she has children:  "Sarah, Mary, Barbara, Alex – that's it.  I think that comes to five or six."  Lucille was then sworn in.  The judge reiterated she was not in trouble.  Lucille said, "No, I don't want to be in trouble, and if I am in trouble, I want you to tell me right now, because I'm scared as it is."

29.

Alex's counsel then conducted voir dire of Lucille. Counsel asked Lucille how she felt about Alex and Lucille said, "Alex is a little hard to get along with." She added that she hates to say that, and said, "[W]e just don't get along. I'm sorry to say that. It's terrible for a mother to say that." When asked if she was afraid of Alex, she answered, "No, I feel sorry for him. I'm not afraid of him." She added: "But, honestly, I hate to say this, but my girls don't get along with him either. I'm sorry." She said she knows that Alex would never strike her, but that Alex is a loner.

The judge asked Lucille again if she understood why she was there today and Lucille answered, "No, I have no idea." Lucille then spontaneously stated, "But, you know, I think this gentleman here, he looks like the type could talk to Alex, and I think Alex would talk to him. But I don't know if he wants to talk to Alex." The "gentleman" she was referring to was her own attorney, Timothy Thompson. Lucille then said to Thompson, "You look like a very calm person."

Her counsel, Thompson, then conducted voir dire. He asked Lucille if they had ever met before and Lucille said she did not think so. Lucille also said she did not know her other attorney, Niki Cunningham, who was also present. Lucille then spontaneously turned to the judge and asked, "Are you a judge?" Thompson asked Lucille if she remembered Alex taking her to see a lawyer and Lucille said Alex had not taken her to see a lawyer. Lucille also said she does not remember the name of the caregiver who was sitting behind her while she was testifying.

Alex's counsel then conducted further voir dire. Lucille testified that she did not think Sarah would ask for a restraining order against Alex on her behalf and that she had never talked to Sarah about wanting to be kept away from Alex. The following colloquy took place:

> "[ALEX'S COUNSEL]: Well, do you want to see Alex?
>
> "[LUCILLE]: If he does that, I have to—there's a good lawyer, right there, if he doesn't go against me.

30.

"[THOMPSON]:  I won't go against you, Mrs. Pilibos.

"[LUCILLE]:  I'll hire you.

"[ALEX'S COUNSEL]:  Well, Mrs. Pilibos, do you want to be kept away from Alex?

"[LUCILLE]:  I'm sorry, honey?

"[ALEX'S COUNSEL]:  Do you want to be kept away from Alex?

"[LUCILLE]:  What does she mean?"

Lucille explained Alex was good at one time until he "just turned different."  She stated that she does not think she has a will or a trust and that she does not know how things should be divided between her children.  Lucille said, "Maybe after this program, I better do something.  And there's a good judge over there.  Oh, no, he's a lawyer.  You are a lawyer."  She continued, "I have to get a good lawyer and have him help me to say do it like this.  You do it like this so it comes out even with all of them.  Then I really like to get a good lawyer."

Lucille stated Alex has never pressured her to see a lawyer or to sign any documents, and he has never discussed a will or trust with her.  She also said she is not scared to talk to Alex.  The following colloquies took place between Alex's counsel and Lucille:

"[ALEX'S COUNSEL]:  Have you ever asked Alex to help you get an attorney?

"[LUCILLE]:  I don't think so.  He went to law school, and I met nice boys, and I used to say, 'Alex, you know, a lot of those boys don't have a chance to have dinner.'  I says, 'I make dinner for you.  I don't care if you bring five kids, six kids.  However many you want to bring, bring them to my house, and when I make your dinners, I'll feed those boys too.  And I really meant it, and, but he never brought anybody home.' "

Alex's counsel also asked if Lucille would like to get a lawyer to help her children share equally in her estate, and Lucille answered:  "I absolutely have to get a lawyer to help me, and right now, I don't have a lawyer.  But what I'd probably do is ask the kids.

31.

I'd ask the girls, 'Let's get a good lawyer." Regarding if she would mind talking about her trust and estate with Alex, Lucille said, "No, I wouldn't mind talking it over with him. Because I don't even have it now. I should do something. I think I see a good lawyer over there."

Lucille said she would "love it" if Alex and the whole family got together. She said that would be "wonderful." After being told by counsel that she had met her attorney Robyn Esraelian on several occasions and then being asked if she remembered Esraelian, Lucille said she did not.

The court ultimately ruled that Lucille was competent to testify because she was capable of expressing herself and understood the need to tell the truth. However, the court noted Lucille became confused about some things, which "[would] go into the assessment of her credibility as a witness."

## IV. Trial court's statement of decision

Following the conclusion of testimony, Sarah orally amended her pleadings, requesting an order restraining Alex from (1) speaking directly or indirectly with Lucille about her estate plan and (2) presenting Lucille any documents for her signature. The court issued its oral tentative decision on March 8, 2021. The tentative decision confirmed hearsay evidence was admissible in the proceeding.

The court issued its final written statement of decision on May 6, 2021. The statement of decision issued the following restraining order, restraining Alex from the following conduct:

"(1) intimidating, harassing, or disturbing the peace of Lucille Pilibos; (2) directly or indirectly discussing Lucille Pilibos' estate plan with her; (3) directly or indirectly requesting or pressuring Lucille Pilibos to make any changes to her estate plan; and (4) directly or indirectly requesting that Lucille Pilibos sign any documents, or presenting documents to Lucille Pilibos to sign."

The restraining order is to remain in effect until the end of the day on March 8, 2022.

Regarding the admissibility of hearsay evidence, the statement of decision stated: "Pursuant to Code of Civil Procedure sections 527.6(i) and 527.8(j), at the hearing on a request for restraining order, a trial court may consider relevant hearsay evidence. (See also *Kaiser Foundation Hospitals v. Wilson* (2011) 201 Cal.App.4th 550 [(*Kaiser*)].)" The court continued: "The Court finds that the hearsay statements attributed to Lucille Pilibos are relevant. Therefore, the Court considered the hearsay statements attributed to Lucille that were offered into evidence by both parties at trial. In weighing the evidence presented at the trial, the Court finds the hearsay statements attributed to Lucille by non-family members were credible. In weighing the evidence presented at trial, the Court finds that the hearsay statements attributed to Lucille by certain members of her family were less credible and not as reliable."

The court acknowledged its ruling that Lucille was competent to testify as a witness, but also noted that Lucille had difficulty remembering many things and became confused at times during her testimony. The court stated, "Lucille's impaired memory and mental state impacted the Court's assessment of the credibility of her testimony."

The court stated it "found Alex Pilibos to be evasive in his testimony, elusive, and not credible. Alex testified that his mother wanted to speak with a lawyer about her estate plan, and he was simply trying to facilitate her request. The Court finds this claim by Alex to be inconsistent with the testimony of Robyn Esraelian and Joseph Doerr both of whom the court finds to be credible witnesses."

The statement of decision contained a "Summary of Key Factual Findings and Conclusions." The court concluded that a preponderance of the evidence showed that "Alex was pressuring his mother Lucille to meet with an attorney, to change her estate plan, and to sign documents that she did not want to sign and of which she did not understand the impact. Based on the evidence presented at trial, it appears to the Court

33.

that when Alex found out the terms of Lucille's trust, he began a campaign to convince his mother to change her estate plan. In the Court's assessment, Alex attempted to coerce and convince Lucille to change her estate plan through pressure and deception."

Regarding the June 5 incident, the court found "that Alex engaged in intimidating behavior by coercing Lucille into making an appointment with a lawyer and forcing her to go meet with an attorney when she clearly did not want to go and had no understanding of where she was going and why she was going there." The court further found Lucille was "manipulated into terminating [Esraelian] and to making an appointment with another attorney that Alex had selected."

The court concluded that Alex's actions constituted harassment, disturbed Lucille's peace, and caused her mental suffering. The court further stated it was clear from Doerr, Esraelian, and Ventura's testimony that Lucille was "extremely distressed and scared" the day she met with Doerr.

## DISCUSSION

### I. Hearsay evidence

Alex first contends the trial court, relying on inapplicable statutes, erroneously admitted and relied on hearsay in ruling on the Welfare and Institutions Code section 15657.03 petition. He contends that there was a large amount of hearsay admitted and that the sheer amount of this evidence prejudiced him.

We conclude Alex is partly correct. He is correct that the trial court incorrectly concluded that Code of Civil Procedure sections 527.6 and 527.8 apply in Welfare and Institutions Code section 15657.03 proceedings. He is also correct that section 15657.03 does not provide that hearsay is generally admissible in proceedings brought under that statute.

However, the record does not show that Alex was prejudiced by the erroneous admission of any hearsay. Most of the hearsay statements Alex calls to our attention were admissible under the state of mind exception to the hearsay rule codified in

34.

Evidence Code section 1250. Other statements he notes in his briefing were not hearsay at all because they were not inherently true or false. Alex's briefing points to only five inadmissible hearsay statements introduced at the 12-day hearing, and we conclude these statements did not result in prejudice warranting a new hearing.

We therefore affirm on this ground.

## A. Standard of review

Trial court rulings on the admissibility of evidence are generally reviewed for abuse of discretion. (*IIG Wireless, Inc. v. Yi* (2018) 22 Cal.App.5th 630, 655 (*IIG Wireless*).) " 'If the court's decision is influenced by an erroneous understanding of applicable law or reflects an unawareness of the full scope of its discretion, the court has not properly exercised discretion under the law.' " (*Cooper v. Bettinger* (2015) 242 Cal.App.4th 77, 90 (*Cooper*).) " 'Therefore, a discretionary order based on an application of improper criteria or incorrect legal assumptions is not an exercise of informed discretion and is subject to reversal.' " (*Ibid.*)

However, " '[a] judgment of the trial court may not be reversed on the basis of the erroneous admission of evidence, unless that error was prejudicial. (Code Civ. Proc., § 475.)' [Citation.] 'The record must show that the appellant "sustained and suffered substantial injury, and that a different result would have been probable if such error ... had not occurred or existed. There shall be no presumption that error is prejudicial, or that injury was done if error is shown." [Citation.] Additionally, article VI, section 13, of the California Constitution provides that a judgment may not be set aside based on the erroneous admission of evidence "unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." Evidence Code section 353 reinforces that provision: we may not reverse a judgment by reason of the erroneous admission of evidence unless ... [¶] ... [¶] ... the error or errors complained of resulted in a miscarriage of justice." ' " (*IIG Wireless, supra,* 22 Cal.App.5th at p. 655.)

## B.    Code of Civil Procedure sections 527.6 and 527.8 were inapplicable

We begin by stating that the trial court erroneously concluded that Code of Civil Procedure sections 527.6 and 527.8 apply in proceedings under Welfare and Institutions Code section 15657.03. Code of Civil Procedure section 527.6 provides an expedited procedure for issuing a limited-scope and limited-duration injunction in instances of harassment, which is narrowly defined by that section. Conduct that is outside the definition of harassment cannot be enjoined under the summary procedures of section 527.6 even if it might ultimately be enjoined under ordinary injunctive procedures after full development of the facts and law. (*Byers v. Cathcart* (1997) 57 Cal.App.4th 805, 811—812.) The trial court in this case apparently believed that this statute applied to all restraining order proceedings, regardless of under which statute the restraining order request was sought. But this is incorrect. Section 527.6 is not broadly applicable to all restraining order proceedings. Section 527.6 and Welfare and Institutions Code section 15657.03 also do not reference each other. The trial court erred in ruling Code of Civil Procedure section 527.6 had any bearing at all on the proceedings below. [6]

Code of Civil Procedure section 527.8 was equally inapplicable. That statute, enacted as the "Workplace Violence Safety Act" in 1994, allows a corporate employer to obtain injunctive relief on behalf of an employee to prevent acts of violence in the workplace. (Stats. 1993-94, 1st Ex. Sess., ch. 29 (A.B. 68), § 2, eff. Nov. 30, 1994;

---

[6] Welfare and Institutions Code section 15657.03, subdivision (d), provides in part: "Upon filing a petition for protective orders under this section, the petitioner may obtain a temporary restraining order in accordance with Section 527 of the Code of Civil Procedure, except to the extent this section provides a rule that is inconsistent." Code of Civil Procedure section 527.6 is not specifically referenced anywhere in the statute. And section 527, as it applies to Welfare and Institutions Code section 15657.03, only governs the issuance of temporary restraining orders. The trial court in this case denied Sarah's request for a temporary restraining order; this is an appeal from an order granting a protective order. Thus, section 527 does not apply here either because of the specific order appealed from.

*Scripps Health v. Marin* (1999) 72 Cal.App.4th 324, 333—334 (*Scripps Health*).)
"Given that section 527.6 only allowed injunctive relief for natural persons [citation], section 527.8 was enacted to allow a corporate employer to bring such an action on behalf of an employee. Section 527.8 was thus intended to enable employers to seek the same remedy for its employees as section 527.6 provides for natural persons." (*Scripps Health*, at pp. 333—334.) Section 527.8 closely parallels section 527.6, and likewise makes no reference to Welfare and Institutions Code section 15657.03. It thus has no application to the proceedings in this case.

Code of Civil Procedure sections 527.6, subdivision (i) and 527.8, subdivision (j) are identical: "At the hearing, the judge shall receive **any testimony that is relevant** and may make an independent inquiry." (Emphasis added.) This emboldened language "has been interpreted to mean hearsay evidence, such as a declaration or police report, is admissible during hearings conducted pursuant to section 527.6" and section 527.8. (*Yost v. Forestiere* (2020) 51 Cal.App.5th 509, 521, citing *Duronslet v. Kamps* (2012) 203 Cal.App.4th 717, 728—729 [interpreting in the context of § 527.6; see also *Kaiser, supra,* 201 Cal.App.4th at p. 557 [interpreting same language in context of § 527.8].) The trial court was aware these statutes had been interpreted as generally allowing hearsay in proceedings they control and erred in concluding these statutes applied here.

We will next demonstrate how Welfare and Institutions Code section 15657.03 does not provide that hearsay is generally admissible in proceedings brought under it.

### C. Interpreting Welfare and Institutions Code section 15657.03

Our interpretation of Welfare and Institutions Code section 15657.03 is guided by well-established legal principles governing our standard of review and the interpretation of statutes. We will first set forth these governing principles, and then demonstrate how applying these principles leads to our conclusion that section 15657.03 clearly and unambiguously does not provide that hearsay is generally admissible in proceedings brought under that statute.

### 1.    *Principles of statutory interpretation*

When interpreting statutory language, " '[w]e begin with the fundamental rule that our primary task is to determine the lawmakers' intent.' [Citation.]  The process of interpreting the statute to ascertain that intent may involve up to three steps. [Citations.]  … We have explained this three-step sequence as follows:  'we first look to the plain meaning of the statutory language, then to its legislative history and finally to the reasonableness of a proposed construction.' " (*MacIsaac v. Waste Management Collection & Recycling, Inc.* (2005) 134 Cal.App.4th 1076, 1082 (*MacIsaac*).)

"In the first step of the interpretive process we look to the words of the statute themselves.  [Citations.]  The Legislature's chosen language is the most reliable indicator of its intent because ' "it is the language of the statute itself that has successfully braved the legislative gauntlet." '  [Citation.]  We give the words of the statute 'a plain and commonsense meaning' unless the statute specifically defines the words to give them a special meaning." (*MacIsaac, supra,* 134 Cal.App.4th at pp. 1082—1083.)  " 'It is axiomatic that in the interpretation of a statute where the language is clear, its plain meaning should be followed.' " (*Security Pacific National Bank v. Wozab* (1990) 51 Cal.3d 991, 998.)  Furthermore, we are not empowered to insert language into a statute, as "[d]oing so would violate the cardinal rule of statutory construction that courts must not add provisions to statutes." (*Ibid.*; see also Code Civ. Proc., § 1858 ["[i]n the construction of a statute …, the office of the Judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted, or to omit what has been inserted …."].)  "If the statutory language is clear and unambiguous, our task is at an end, for there is no need for judicial construction.  [Citations.]  In such a case, there is nothing for the court to interpret or construe." (*MacIsaac, supra,* 134 Cal.App.4th at p. 1083.)

### 2. Analysis

Welfare and Institutions Code section 15657.03 clearly and unambiguously does not provide that hearsay is generally admissible in proceedings brought under that code section. Hearsay is "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) Unless subject to an exception, hearsay evidence is inadmissible. (Evid. Code, § 1200, subd. (b).) "Except as otherwise provided by statute," the Evidence Code applies in every action conducted before courts in this state. (Evid. Code, § 300.)

There is only one subdivision in Welfare and Institutions Code section 15657.03 bearing on the admissibility of evidence. Subdivision (c) of section 15657.03 states: "An order may be issued under this section, with or without notice, to restrain any person for the purpose of preventing a recurrence of abuse, if a declaration shows, to the satisfaction of the court, reasonable proof of a past act or acts of abuse of the petitioning elder or dependent adult."

This subdivision does not provide, expressly or implicitly, that hearsay is generally admissible in proceedings for dependent adult protective orders. Welfare and Institutions Code section 15657.03, subdivision (c) only provides that a court may issue a protective order based on a written declaration alone. A declaration is an unsworn, written statement made under penalty of perjury whenever state law requires or permits facts to be proved by affidavits or other sworn statements. (Code Civ. Proc., § 2015.5.) "Declarations and affidavits are frequently used as a substitute for sworn oral testimony" when statutorily permitted. (O'Connor's Cal. Practice (2021 ed.) Civil Pretrial, Ch. 1-B, § 4.) "In the absence of statutory permission, an affidavit is not competent evidence, although made under oath, because it is hearsay." (*In re Estate of Horman* (1968) 265 Cal.App.2d 796, 805; see Evid. Code, § 1200 [hearsay rule].) The same rule should apply to declarations. But even when a declaration is statutorily authorized for use in a

specific proceeding, its contents must be based on personal knowledge and be otherwise admissible. (*Kulshrestha v. First Union Commercial Corp.* (2004) 33 Cal.4th 601, 609.)

Thus, the only substitute for sworn oral testimony in proceedings under Welfare and Institutions Code section 15657.03 is a declaration based on personal knowledge; there are no other exceptions. The plain and unambiguous interpretation of the statute then is that hearsay is not generally admissible in proceedings under section 15657.03. Since the statute is plain and unambiguous on this point, our analysis ends here.

Alex's argument largely relies, unnecessarily, on a distinguishing of Welfare and Institutions Code section 15657.03 from Code of Civil Procedure sections 527.6 and 527.8. We have already demonstrated the dissimilarity between section 15657.03 and the two Code of Civil Procedure sections. Section 15657.03's meaning is clear and unambiguous from its plain language, and we therefore need not resort to comparing it to other statutes.

Sarah's briefing also has a misplaced focus concerning the interpretation of Welfare and Institutions Code section 15657.03. Sarah's argument is largely based on her contention that interpreting section 15657.03 as generally allowing hearsay in proceedings under that section would make for good public policy and would further the Elder and Dependent Adult Abuse Prevention Act's stated purpose of providing greater protection for vulnerable adults. Sarah gleans the Act's purpose from section 15600, subdivision (a), as well as legislative committee analyses. (See Assem. Com. on Aging and Long-Term Care, Analysis of Assem. Bill No. 59 (1999—2000 Reg. Sess.) May 28, 1999; and Sen. Rules Com., Analysis of Assem. Bill No. 59 (1999—2000 Reg. Sess.) Sept. 2, 1999.) First, it is improper to turn to legislative materials and policy considerations to interpret a statute when its language is clear and unambiguous. (*In re A.L.* (2015) 243 Cal.App.4th 628, 641.) Additionally, section 15657.03 no doubt furthers the goal of providing greater protection for vulnerable adults; whether it furthers the goal in the exact manner Sarah wishes it did is irrelevant to our analysis.

## C.    No prejudice

### 1.    *Standard for reversal*

We briefly restate the standard for reversal.  Erroneous introduction of evidence must result in a miscarriage of justice and reversal should be granted only where the reviewing court is convinced that it is reasonably probable that a more favorable result to the appellant would have been reached but for the error.  (Evid. Code, § 353; *Brokopp v. Ford Motor Co.* (1977) 71 Cal.App.3d 841, 853.)

### 2.    *Analysis*

Despite that the trial court erred in concluding hearsay was generally admissible in this proceeding, Alex has not demonstrated he was prejudiced by the admission of any inadmissible hearsay.  He contends the proceeding was "truly a trial by hearsay," and his briefing calls 20 allegedly inadmissible statements to our attention that the trial court relied on in its statement of decision.  Alex clearly does not mean to say there were only 20 inadmissible hearsay statements admitted at the hearing; we understand these 20 statements are but a sampling of what he believes were the most prejudicial ones.  However, as we have stated, only five of these 20 statements were inadmissible hearsay that should have been excluded.  These five inadmissible statements were not so prejudicial to constitute a miscarriage of justice warranting a new hearing.

The 20 statements are cited in a single paragraph in Alex's opening brief.  We have inserted bold numbers to count the statements:

> "[I]n rendering its decision, the court relied almost exclusively on hearsay statements allegedly made to others by Lucille and Alex.  The court stated it was relying principally on the hearsay statements from non-family members.  [Citation.]  Those non-family member statements, as recited in the statement of decision, are replete with statements like 'Lucille told' Ms. Ventura **(1)**, Ms. Ventura 'heard Alex ask Lucille' **(2)**, 'Lucille would say' **(3)**, 'Ms. Ventura was present during Lucille's conversation with Mr. Doerr and heard Lucille say' **(4)**, Lucille 'asked Ms. Ventura' **(5)**, 'Alex called Lucille and said' **(6)**, Lucille 'asked Ms. Ventura' **(7)**, 'Lucille stated' to Ms. Esraelian **(8)**, 'Lucille also told Ms. Esraelian' **(9)**, 'Lucille

41.

told Ms. Esraelian on multiple occasions' **(10)**, 'Lucille had made it clear' to Ms. Esraelian **(11)**, 'Lucille told Ms. Esraelian' **(12)**, 'Lucille made it very clear to' Mr. Doerr **(13)**, and 'Lucille stated' to Mr. Doerr **(14)**. [Citation.] There are also six statements stating "Lucille told Mr. Doerr.' " **(15—20)**

The difficulty in analyzing any of these 20 statements is that the above block quote, taken from Alex's brief, contains only bits of the trial court's paraphrasing of the witnesses' statements. However, we have carefully reviewed the record for each of the 20 statements from which the trial court derived its paraphrasing. We conclude only five of these statements were inadmissible hearsay, and 11 others were admissible as statements of Lucille's then-existing state of mind (Evid. Code, § 1250). The remaining four statements were not hearsay because they were not inherently true or false.

We will analyze the 20 statements in three groups: the inadmissible hearsay statements, the admissible hearsay statements, and the non-hearsay statements. We will discuss in our analysis of the inadmissible hearsay statements how the admission of those statements did not prejudice Alex, meaning that there is no reasonable probability of a different outcome had the court excluded them.

### a. *Inadmissible hearsay statements*

As we have already stated, under the hearsay rule, subject to several exceptions, "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated" is generally inadmissible. (Evid. Code, § 1200.) The first, ninth, twelfth, fifteenth, and sixteenth statements numbered above were inadmissible hearsay; we will analyze each of them.

The first numbered statement in the statement of decision reads: "Ms. Ventura testified that Lucille told her that there was a distance between her and Alex[.]" This statement by Lucille was obviously offered to prove that there was distance between Lucille and Alex, and we can discern no applicable statutory exception to the hearsay rule that would allow for it to be admitted. It therefore should have been excluded. However,

42.

this statement's admission did not prejudice Alex because multiple witnesses testified to the fact that Lucille and Alex were not close, and that Alex did not visit often. The trial court's statement of decision noted Sarah's testimony that Alex visited Lucille "irregularly." The court also noted Ventura's testimony, apparently based on Ventura's own observation, that Alex did not visit Lucille regularly.

The ninth numbered statement in the statement of decision reads: "Lucille also told Ms. Esraelian words to the effect that Alex kept trying to get Lucille to do something she did not want to do." It is clear from the context in the statement of decision that the court relied on this statement for the truth of the assertion that Alex kept trying to get Lucille to do something she did not want to do. The statement was hearsay and we cannot discern an applicable exception. However, the fact that Alex kept trying to get Lucille to do something she did not want to do—specifically, change her estate plan— was established by a wealth of other evidence, and Alex was therefore not prejudiced. Multiple witnesses testified that Lucille had stated that she did not want to change her estate plan, and Doerr testified that Lucille told him multiple times that she was "terrified" of Alex. As we will demonstrate in the following section, these other statements were admissible under the state of mind exception to the hearsay rule (Evid. Code, § 1250).

The twelfth numbered statement in the statement of decision reads: "Lucille told Ms. Esraelian that the only reason she made the call [terminating Esraelian] was because someone was at her home with her, dialed the phone, handed the phone to her, and told her to do what we tell you to do, and Lucille was following their instructions." The trial court cited to Exhibit no. 16, a letter from Esraelian to Alex's counsel, for this statement. In the letter, Esraelian relates to Alex's counsel what Lucille told Esraelian regarding what happened the day Lucille called and left Esraelian a voice message purportedly firing her. The court clearly relied on this statement for the truth of the matter asserted therein and this statement was thus inadmissible.

43.

However, the twelfth statement was not prejudicial because other evidence noted in the statement of decision supported the court's finding that Lucille was coerced into calling and terminating Esraelian. Alex's phone records from that day, showed 15 calls to and from Barbara, five to and from Mary, three to and from Alex's attorneys at Wild, Carter & Tipton, and two to Doerr. Additionally, the voice message from Lucille stated she "found out" she no longer needed Esraelian's services, which indicated someone else was behind the idea to terminate Esraelian. Moreover, Esraelian also testified that Lucille told her in person the day after the voice message that she did not want to terminate Esraelian, and Alex does not challenge this statement as inadmissible hearsay.[7]

The fifteenth statement reads: "Lucille told Mr. Doerr that her son Alex had come to the house and told her to get in the car, and she did as she was instructed." This statement was obviously offered to prove the truth of the matter asserted and thus should have been excluded. However, it was not prejudicial because Alex himself admitted in his testimony that he came to Lucille's house on June 5 and told her he was taking her to lunch and that Lucille got into the car with him. Ventura also testified consistently to those exact facts.

The sixteenth statement reads: "Lucille told Mr. Doerr that she thought Alex was taking her to lunch, and she did not want to come to see Mr. Doerr." This statement was introduced solely to prove the truth of the matter asserted. However, it was not prejudicial because Doerr also testified that Lucille told him, "Well, I'm not sure why I'm here. I don't want to be here." This quoted statement was not noted in the statement of decision and not challenged by Alex. It is hearsay, but it is admissible under Evidence Code section 1250 as a statement of Lucille's then existing state of mind. Moreover, we

---

[7] Even if Alex did challenge it as inadmissible hearsay, we would find it was admissible as evidence of Lucille's then existing state of mind (Evid. Code, § 1250).

44.

have already mentioned that Alex admitted that he told Lucille he was taking her to lunch when he arrived at her house that day.

None of these five inadmissible statements were in the least bit prejudicial, mainly because there was other ample evidence establishing the contents of those statements.

### b. State of mind exception to hearsay rule

"Except as otherwise provided by statute, all relevant evidence is admissible." (Evid. Code, § 351.)  Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.)

Evidence Code section 1250 provides an exception for "evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health)."  For this exception to apply, the statement must not have been made under circumstances indicating a "lack of trustworthiness" (Evid. Code, § 1252), and must be offered either "to prove the declarant's state of mind, emotion, or physical sensation," or "to prove or explain acts or conduct of the declarant."  (Evid. Code, § 1250, subd. (a).)  "A prerequisite to this exception is that the declarant's mental state or conduct be placed in issue."  (*People v. Kovacich* (2011) 201 Cal.App.4th 863, 884 (*Kovacich*).)

An important point is that " 'a statement which does not directly declare a mental state, but is merely circumstantial evidence of that state of mind, is not hearsay.  It is not received for the truth of the matter stated, but rather whether the statement is true or not, the fact such statement was made is irrelevant to a determination of the declarant's state of mind.' "  (*Kovacich, supra,* 201 Cal.App.4th at p. 885.)

Eleven of the statements we numbered were hearsay statements admissible under the state of mind exception of Evidence Code section 1250.  Four of these statements involved Lucille stating she is afraid of Alex, and six others involved Lucille stating she does not want to change her estate plan.  All these statements were offered to prove the

45.

truth of their contents and were therefore hearsay. But they were all statements Lucille made of her then existing state of mind, specifically of her intent to keep her estate plan, and of her then existing emotion. Lucille's mental state at the time she made these statements was relevant in these proceedings because two of the central issues were whether Alex was trying to get Lucille to act against her will and whether Alex's conduct caused her mental suffering. These statements were probative of Lucille's wishes and of her emotional experiences.

The one other statement involved Alex telling Lucille that he wanted to bring a friend over to her house to discuss Lucille's estate plan. This statement was offered to prove Alex's then existing intent to bring someone over to Lucille's house, and as such was admissible under Evidence Code section 1250. The statement was relevant because it proved that Alex intended to continue talking with Lucille about her estate plan even after he had been instructed multiple times not to, and even after he had already taken Lucille days earlier to see Doerr.

### i. Evidence Code section 1252

Alex states that the trial court never determined whether any of the hearsay statements were subject to any exceptions in light of its ruling that all relevant hearsay was admissible. As such, he contends he never had any opportunity to present evidence or argument regarding the applicability of any exceptions.[8] He states this court is not able to address the trustworthiness issues in the first instance.

_____

[8] While neither party makes an issue of it, we note that Alex agreed that Sarah could have a "standing response" to his standing objection regarding the admissibility of hearsay. Sarah's standing response meant that all hearsay, if inadmissible generally, would be admissible under some statutory exception to the hearsay rule. We presume this broad standing response included the contention that all of Lucille's statements favorable to Sarah's position would not be excludable under Evidence Code section 1252. Perhaps it is inconsistent for Alex to agree to the standing response below, and then on appeal complain that the trial court did not give him the chance to present evidence on the admissibility of exceptions. Maybe he deprived himself of that chance by agreeing to the standing response. Alex could have, and perhaps should have, not

Specifically with respect to the state of mind exception of Evidence Code section 1250, Alex contends the trial court did not conduct the required analysis regarding the trustworthiness of the purported statements. "Evidence of the declarant's state of mind, even if otherwise admissible under Evidence Code section 1250, is inadmissible 'if the statement was made under circumstances such as to indicate its lack of trustworthiness.' (Evid. Code, § 1252.)" (*People v. Livaditis* (1992) 2 Cal.4th 759, 779.) "To be admissible under Evidence Code section 1252, statements must be made in a natural manner, and not under circumstances of suspicion, so that they carry the probability of trustworthiness. Such declarations are admissible only when they are ' "made at a time when there was no motive to deceive." ' " (*People v. Edwards* (1991) 54 Cal.3d 787, 820.)

First, we are not convinced that the trial court did not consider the trustworthiness of the hearsay statements subject to the state of mind exception. The court's duties as the trier of fact in this case included determining the weight and credibility of the evidence. (*In re Marriage of Oliverez* (2019) 33 Cal.App.5th 298, 319.) The court stated in its statement of decision it "strongly consider[ed]" Lucille's hearsay statements as testified to by non-family members, which we take to mean the court found those hearsay statements to be credible and capable of supporting legal conclusions. We do not believe the trial court would have given such weight to hearsay statements attributable to Lucille had the court believed they were made in circumstances indicating they were untrustworthy.

---

agreed to the standing response and instead stated on the record that he wanted a chance to present evidence regarding exceptions to the hearsay rule.

We are not holding any of this against Alex. We only bring this to the parties' and the court's attention to show the danger in liberally agreeing to and granting standing objections and responses. Parties and trial courts can inadvertently create waiver and forfeiture issues that can doom an appeal.

47.

Moreover, the court's statement of decision implies that the court afforded less credibility to some of the hearsay attributable to Lucille. For example, several witnesses testified they had heard Lucille say she wanted her estate equally divided among all her children. There were even recordings of Lucille saying that. However, the implication is that the trial court believed Lucille made those statements while under pressure from Alex and others working with him. Thus, in our view, the statement of decision shows that the trial court thoughtfully analyzed the hearsay statements attributable to Lucille and reached a considered conclusion on the trustworthiness of each one.

Additionally, both parties had the opportunity and the motive to elicit testimony from the witnesses regarding the circumstances in which Lucille made her statements. Each side had the motive to bolster the credibility of some of Lucille's statements and attack the credibility of others. All the witnesses were asked how they perceived Lucille to be while she made certain statements to them. There was much testimony about Lucille's mental alertness at various times, her people-pleasing personality, the quality of her relationships with different persons, and whether she seemed to be expressing her true feelings at various times. In our view, the parties made diligent efforts to portray the circumstances in which Lucille made various statements. We conclude from this that the trial court had sufficient evidence of these circumstances for it to earnestly gauge the trustworthiness of the statements. We also note that the trial court deemed certain witnesses credible and others not credible, and accepted certain narratives and rejected others. The court could not have done this without analyzing the trustworthiness of Lucille's various statements introduced via hearsay. We have no basis for second guessing these determinations.

### c. *Nonhearsay statements*

The purpose of the hearsay rule is to exclude statements made when the declarant was not under oath and not subject to cross-examination, because the trier of fact is unable to properly gauge the veracity of such statements. (*People v. Cudjo* (1993)

48.

6 Cal.4th 585, 608.)  But concerns about whether a declarant was telling the truth are not implicated when the only relevance of the statement is the mere fact that it was made.  Some statements are considered " 'verbal conduct,' " meaning they are neither true nor false, and therefore cannot be hearsay.  (*People v. Cowan* (2010) 50 Cal.4th 401, 472.)  A proposal to perform an act falls within the category of verbal conduct, because a statement offering to do something cannot be true or false.  (*Ibid.* [defendant's statement offering to " 'come down right now' " and talk to police was not hearsay].)  Similarly, a question or request has no inherent truth or falsity and is not hearsay.  (*People v. Jurado* (2006) 38 Cal.4th 72, 117 (*Jurado*).)

In *Jurado*, the declarant's statement was a request that a friend get her a "gat" (a slang term for a gun), because she had a problem she needed to take care of.  The portion of the statement where the declarant asked for a gun was not hearsay because such a request does not assert the truth of any fact.  (*Jurado, supra,* 38 Cal.4th at p. 117.)

The second, third, fifth, and seventh numbered statements were not hearsay because they all referenced questions or directives from the declarants.  The second statement related Alex asking Lucille to see an estate planning attorney.  The third statement related Lucille asking Ventura after Alex left her house, "Why does he want to change it?  What does he want?"  The fifth statement relates Lucille asking Ventura, "What does he want from me?"  And the seventh statement relates to Lucille asking Ventura to lock the doors in the house, unplug the phone, and close the curtains.  None of these statements have any underlying truth or falsity and are therefore not hearsay.

In conclusion, Alex was not prejudiced by the court's erroneously ruling that hearsay was generally admissible in this proceeding.  There was indeed a lot of hearsay introduced at the hearing, too much for Alex to be reasonably expected to analyze in his briefing.  However, we would expect that his sample of 20 allegedly inadmissible hearsay statements would comprise the most prejudicially inadmissible ones.  However, as we

49.

have explained, only five of them were inadmissible, and none were proven to be prejudicial.

## II.    Exclusion of settlement agreement

Alex next contends the trial court abused its discretion by sustaining an objection to testimony about a settlement offer Alex made to Sarah during the several-month break in the hearing.

After the court heard Sarah's, Ventura's, Doerr's, and part of Alex's testimony, and during the extended break in testimony due to a health issue, Alex made a settlement offer to Sarah.  Alex's offer proposed that Sarah and Alex agree to a "mutual non-CLETS Agreement."[9]  The general points of the proposal were these:  (1) for nine months, neither he nor Sarah would speak with Lucille about her estate plan; (2) Sarah would dismiss the underlying restraining order action without prejudice; and (3) the parties would agree that Lucille speak to an independent third party about her estate planning desires and report back to the parties regarding Lucille's wishes.  The proposal also stated that, if the third party reported that Lucille does not want to change her estate plan, Alex would dismiss the action he filed in August 2020 seeking, among other things, to remove Sarah as co-trustee of the 2012 trust and to direct a modification of the trust.

Alex sought to admit the settlement offer into evidence as well as testimony about it.  Sarah's counsel objected, arguing it was inadmissible as a settlement communication. The court sustained the objection, but on relevance grounds.  The court stated, "I think

---

[9] Welfare and Institutions Code section 15657.03, subdivision (p), subparts (2) and (3), set forth the two alternative methods for transmitting protective order information to the Department of Justice.  Under subpart (2), the petitioner may transmit a copy of the protective order to each law enforcement agency having jurisdiction over the petitioner's residence.  Alternatively, under subpart (3), the court must either transmit a copy of the order to a local law enforcement agency authorized by the Department of Justice to enter orders into the California Law Enforcement Telecommunications System (CLETS) or, with the approval of the Department of Justice, enter the order into CLETS directly.

that it is not really relevant to the issues that the Court has to decide today. So I am going to rule that that testimony is not going to be admitted."

Alex correctly notes that "[a]lthough settlement offers are not admissible to prove liability (Evid. Code, § 1152), they may be admitted in evidence to show good faith." (*Lemer v. Boise Cascade, Inc.* (1980) 107 Cal.App.3d 1, 11—12, citing *Warner Constr. Corp. v. City of Los Angeles* (1970) 2 Cal.3d 285, 297—298.) A court may issue a restraining order under Welfare and Institutions Code section 15657.03 if an elder or dependent adult has suffered abuse. (§ 15657.03, subd. (a)(1).) "Abuse" is defined as "[p]hysical abuse, neglect, abandonment, isolation, abduction, or other treatment with resulting physical harm or pain or mental suffering." (§ 15610.073, subd. (a)(1).) Mental suffering is defined in section 15610.53 as "fear, agitation, confusion, severe depression, or other forms of serious emotional distress that is brought about by forms of intimidating behavior, threats, harassment, or by deceptive acts performed or false or misleading statements made with malicious intent to agitate, confuse, frighten, or cause severe depression or serious emotional distress of the elder or dependent adult."

Alex interprets Welfare and Institutions Code section 15610.53 to mean that there can be no finding of "mental suffering" without a finding that the person sought to be restrained acted "with malicious intent." Sarah more narrowly construes the phrase "malicious intent" as referring only to "false and misleading statements" in section 15610.53. Alex argues the settlement communication was "highly relevant" to the issue of malicious intent. This is because he believes the proposal corroborates his testimony that his only intent was to make sure Lucille's estate plan is distributed as she actually wishes. He also argues, relatedly, the settlement offer shows there is no need for a restraining order because he is willing to walk away from the issue of Lucille's estate plan if she meets with an independent third party and states she does not want to make any changes to her estate plan. However, Alex fails to acknowledge that the trial court

51.

found him to be "elusive, "evasive," and "not credible," and rejected his narrative that he was only intending to help his mother speak with an attorney.

We need not resolve whether Alex or Sarah has correctly interpreted Welfare and Institution Code section 15610.53. This is because even assuming the settlement offer was relevant to the issue of malicious intent, we are not convinced Alex was prejudiced by the exclusion of evidence regarding the offer. First, Alex testified in other ways about his good faith, lack of malice, and desire to avoid litigation regarding Lucille's estate plan. Alex made clear he only intended to get his mother to an attorney like she had asked so she could discuss her estate plan. He also testified he tried through his counsel to set up a family meeting in part because he felt that would be an effective way to avoid litigation among the family members. However, the trial court disbelieved Alex, and instead concluded based on the testimony of other witnesses he surreptitiously and abusively attempted to get Lucille to change her estate plan. It is highly unlikely the trial court's appraisal of Alex's character and motives would have changed had it admitted evidence regarding the settlement proposal that was made mid-hearing.

Moreover, Alex's argument that the settlement communication tends to prove a restraining order was unnecessary is very weak due to the fact Sarah rejected it and thus left Alex unrestrained. Additionally, even had the trial court admitted evidence of the settlement offer, it could not have forced Sarah to accept it. The trial court at most could have asked Sarah if she wanted to accept it, and it is entirely unlikely she would have. That being the case, even had the trial court accepted evidence of the settlement proposal and concluded it bore on Alex's good faith, it would not have changed the fact that Alex remained unrestrained, nor would it have likely altered the court's finding that Alex abused his elderly mother. In other words, it is unlikely that evidence of the settlement offer would have changed the court's mind that Alex needed to be restrained. There is not a reasonable probability of a different result but for the exclusion of this evidence,

52.

and we therefore affirm on this ground.  (Evid. Code, § 354; *College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715.).)

## III.    Overbreadth

Lastly, Alex contends the restraining order is unconstitutionally overbroad because it impacts Alex's California constitutional rights to free speech more than reasonably necessary to protect Lucille.

### A.    Basic legal principles

Under state and federal law, a restraining order may be unconstitutional because it is vague, overbroad or a combination of the two.  (E.g., *Smith v. Silvey* (1983) 149 Cal.App.3d 400, 406—407 [order prohibiting defendant from " 'contacting' " mobile home park residents was unconstitutionally overbroad and vague]; see *Pittsburgh Press Co. v. Pittsburgh Commission on Human Relations* (1973) 413 U.S. 376, 390 [upholding an order that is "clear and sweeps no more broadly than necessary"].)  Whether a restraining order infringes upon the constitutional rights of the restrained party because it is overbroad, vague, or both presents questions of law subject to de novo review. (*Harris v. Stampolis* (2016) 248 Cal.App.4th 484, 497.)

Alex only contends the restraining order is overbroad.  A restraining order is unconstitutionally overbroad if it impacts the restrained person's constitutional rights more than reasonably necessary to protect the aggrieved party.  (See *People ex rel. Reisig v. Acuna* (2017) 9 Cal.App.5th 1, 22 [injunction may not burden constitutional rights more than necessary to serve the significant governmental interest at stake].)  For example, when an injunction restricts the right to free speech, courts seek "to ensure that the injunction was no broader than necessary to achieve its desired goals."  (*Madsen v. Women's Health Center, Inc.* (1994) 512 U.S. 753, 765.)  Under the foregoing principles, an overbreadth analysis (1) identifies the restrained party's constitutional interests, (2) evaluates how the restraining order impacted those interests, (3) identifies the

protection needed by the aggrieved party, and (4) determines whether restrictions imposed are more than reasonably necessary to protect the aggrieved party.

### B.     Analysis

Alex contends two of the four restraining order provisions are unconstitutionally overbroad because they are not tailored as precisely as possible to the needs of the case. He specifically argues the restraining order should be modified to state he is not permitted to discuss Lucille's estate plan with her if they are alone. He also argues the portion restraining him from presenting *any* documents for Lucille to sign is overbroad because the issues here relate to Lucille's estate plan, and thus the restriction should be limited to documents relating to her estate plan. We reject his arguments.

Alex identifies his right to free speech under the California Constitution as his only constitutional interest that the two specified restraining order provisions implicate. Article 1, section 2, subdivision (a) of the [California] state constitution provides: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right."

" '[P]rior restraints on speech ... are the most serious and the least tolerable infringement on First Amendment rights.' [Citation.] Orders enjoining the right to speak on a particular topic are disfavored and presumptively invalid. [Citation.] However, courts have recognized a prior restraint may be permissible under certain limited circumstances." (*Molinaro v. Molinaro* (2019) 33 Cal.App.5th 824, 831 (*Molinaro*).)

"To establish a valid prior restraint under the federal Constitution, a proponent has the heavy burden to show the countervailing interest is compelling, the prior restraint is necessary and would be effective in promoting this interest, and less extreme measures are unavailable. [Citations.] A permissible order restraining future speech 'must be couched in the narrowest terms that will accomplish the pin-pointed objective permitted by constitutional mandate and the essential needs of the public order.' " (*Molinaro, supra,* 33 Cal.App.5th at pp. 831—832.)

"The California Constitution is more protective of free speech rights than the federal Constitution, and California courts require 'extraordinary circumstances' before a prior restraint may be imposed. [Citations.] Nonetheless, in determining the validity of a prior restraint, California courts engage in an analysis of various factors similar to the federal constitutional analysis [citation], and injunctive relief restraining speech under the California Constitution may be permissible where the relief is necessary to 'protect private rights' and further a 'sufficiently strong public policy' " (*Molinaro, supra,* 33 Cal.App.5th at p. 832.)

We first examine Alex's challenge to the restraining order provision preventing him from speaking with Lucille about her estate plan under any circumstances. This provision of the order no doubt impacts his free speech rights. The question then is whether this restriction on speech is more than is reasonably necessary to protect Lucille from abusive mental suffering. We conclude it is not more than is reasonably necessary.

Alex argues Sarah's testimony establishes that this restraining order provision is more restrictive than is reasonably necessary to protect Lucille and is thus unconstitutionally overbroad. He notes Sarah testified that (1) Lucille loves Alex, (2) Lucille likes to talk to Alex and call Alex, and (3) she is fine with Alex being around Lucille and is comfortable with Lucille having discussions about her estate plan with Alex "if they were in the presence of somebody else."

We disagree that Sarah's testimony, including the third item of testimony just listed, establishes the challenged provision is overbroad as a matter of law. We have no reason to doubt this was Sarah's genuine opinion. But Sarah's opinion was not binding on the trial court and did not impose a limit on the type of order the court could fashion to protect Lucille. The evidence presented at the hearing supported a finding that the estate planning topic caused Lucille mental suffering regardless of who she discussed it with, but especially when she discussed it with Alex. Indeed, Esraelian and Doerr both testified they got the impression Lucille did not want to discuss her estate plan with

55.

anyone at all. There was also a wealth of evidence supporting the court's finding that Lucille was "terrified" of Alex, as well as evidence to support an inference that this terror proceeded from Alex's unrelenting campaign to get Lucille to change her estate plan. There was no evidence in the record indicating that Lucille would not experience mental suffering if she discussed estate planning matters with Alex so long as someone else was present. Thus, we cannot conclude that the restraining order provision was more restrictive than reasonably necessary to accomplish the objective of protecting Lucille.

We next address Alex's second challenge, that the restriction on his presenting any documents at all for her signature is overbroad. Like the first provision, he challenges this provision on free speech grounds only. But he has not even attempted to explain how the act of presenting documents to a person to sign is an act of speech that implicates constitutional free speech rights, and we do not see how free speech rights are implicated here. Alex thus has not identified a constitutional interest that the restriction on presenting documents to Lucille for signature impacts. Our analysis of that restriction therefore ends here.

## DISPOSITION

The trial court's March 8, 2021, order is affirmed. Respondent is awarded her costs on appeal.


SNAUFFER, J.

WE CONCUR:


PEÑA, ACTING P. J.


DE SANTOS, J.


56.